IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

JESS W.,[1]                        §
                                   §
              Plaintiff,           §
                                   §
v.                                 §        Civil Action No. 1:18-CV-00173-BU
                                   §
ANDREW SAUL,[2]                    §
Commissioner of Social Security,   §
                                   §
              Defendant.           §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF**
**THE UNITED STATES MAGISTRATE JUDGE**

This case has been referred pursuant to 28 U.S.C. § 636 and an order of referral from United States District Judge Sam R. Cummings.  Dkt. No. 5.  In accordance with Special Order 3-326, this case was reassigned to the undersigned United States Magistrate Judge on October 1, 2019. Dkt. No. 19.  The parties have not consented to proceed before a magistrate judge.

Plaintiff Jess W. seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Dkt. No. 16.  The Commissioner has filed his response in opposition. Dkt. No. 17. Plaintiff filed a reply. Dkt. No. 18.  After considering the pleadings, briefs, and administrative record, the undersigned recommends that the Court reverse the Commissioner's decision and remand this case for further administrative proceedings.

---

[1] Due to concerns regarding the privacy of sensitive personal information available to the public through opinions in Social Security cases, Plaintiff is identified only by first name and last initial.

[2] Andrew Saul took office as the Commissioner of Social Security on June 17, 2019.  Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is automatically substituted as a party.

1

## I. LEGAL STANDARDS

Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied to evaluate the evidence. *See* 42 U.S.C. § 405(g); *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).

Substantial evidence means more than a scintilla, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a responsible mind might accept to support a conclusion." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). While a reviewing court must scrutinize the administrative record to ascertain whether substantial evidence supports the Commissioner's findings, it may not reweigh the evidence, try issues *de novo*, or substitute its own judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988). "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed." *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (citing 42 U.S. § 405(g)). A reviewing court "may affirm only on the grounds that the Commissioner stated for [the] decision." *Copeland*, 771 F.3d at 923.

To be entitled to social security benefits, a claimant must show that he is disabled within the meaning of the Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In evaluating a disability claim, the Commissioner has promulgated a five-step

sequential process to determine whether: (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity. *See* 20 C.F.R. § 404.1520; *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. Once the claimant satisfies his or her initial burden, the burden shifts to the Commissioner at step five to show that there is other gainful employment in the national economy that claimant is capable of performing. *Greenspan*, 38 F.3d at 236. If the Commissioner shows that other jobs are available to the claimant, the burden of proof shifts back to the claimant to rebut such a finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

The ALJ has a duty to fully and fairly develop the facts relating to a claim for disability benefits. *See Ripley*, 67 F.3d at 557 (citing *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (per curiam); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). If the ALJ does not satisfy this duty, the resulting decision is not substantially justified. *See id*. However, the Court does not hold the ALJ to procedural perfection and will reverse the ALJ's decision as not supported by substantial evidence where the claimant shows that the ALJ failed to fulfill the duty to adequately develop the record only if that failure prejudiced Plaintiff, *see Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012) – that is, only if Plaintiff's substantial rights have been affected, *see Audler*, 501

3

F.3d at 448.  Put another way, Plaintiff "must show that he could and would have adduced evidence that might have altered the result."  *Brock v. Chater*, 84 F.3d 726, 728–29 (5th Cir. 1996).

## II.  PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI, respectively, of the Social Security Act alleging disability due to a development disability, Asperger's syndrome, and epilepsy, and an alleged onset date of June 30, 2008. Tr. 10, 125–128.  The Social Security Administration denied his claims on June 11, 2015, and again after reconsideration on August 26, 2015. Tr. 142, 146, 154, 157.

Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ"). Tr. 165–66.  That hearing was held on June 7, 2017.  *See* Tr. 27–65.

At the time of the hearing, Plaintiff was 30 years old and able to communicate in English. Tr. 18, 32–33.  He had completed high school through special education courses and one and a half years of a college welding program. Tr. 33, 41.

As of the date of the hearing, Plaintiff worked on his parent's ranch. Tr. 34–35.  Previously, in 2013, Plaintiff worked for a family friend at her farm, which included a bed and breakfast and horseback riding program. Tr. 34, 345–47.  Prior to that, Plaintiff spent two summers, in 2008 and 2011, working for another family friend's construction company. Tr. 348–50.  The ALJ determined that Plaintiff's work did not rise to the level of substantial gainful activity. Tr. 13.

Ultimately, the ALJ found that Plaintiff was not disabled and therefore not entitled to benefits. Tr. 20.  Although the ALJ found that Plaintiff's severe impairments included "epilepsy, a cognitive disorder secondary to seizure disorder, Asperger's disorder, and autism spectrum

disorder with accompanying intellectual impairment," *see* Tr. 13, the ALJ nonetheless concluded that these did not meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, *see* Tr. 13–15. The ALJ further determined that Plaintiff had the residual functional capacity ("RFC") to perform the full range of work, with no physical limits except for seizure precautions, but would be limited to simple work. Tr. 15.

Given Plaintiff's age, education, and exertional capacity for the full range of work, the ALJ determined that Plaintiff was not disabled and was otherwise capable of making a successful adjustment to such work. Tr. 18–19. The ALJ concluded that Plaintiff did not have past relevant work but that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. Tr. 18.

Plaintiff appealed that decision to the Appeals Council. Tr. 214. On August 23, 2018,[3] the Appeals Council denied Plaintiff's request for review. Tr. 1–6. Accordingly, the ALJ's decision is properly before this Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff then filed this action in federal district court on October 29, 2018. Dkt. No. 1. In his brief, Plaintiff lists two main grounds for appeal, including that the ALJ's RFC assessment was not supported by substantial evidence and that the ALJ erred in failing to evaluate Plaintiff's intellectual functioning under Appendix I Listing 12.05(B) (Intellectual Disorder). *See* Dkt. No. 16. The Commissioner filed a response, arguing that substantial evidence supports the ALJ's decision and that the ALJ applied the proper legal standards in making that decision. *See* Dkt.

---

[3] Plaintiff's counsel confirms that the Notice of the Appeals Council Action was not received until August 31, 2018.

No. 17.  Plaintiff has filed a reply to the Commissioner's brief.  Dkt. No. 18.

Upon review of the parties' filings and the administrative record in this case, the undersigned concludes that the hearing decision should be reversed, and this case remanded to the Commissioner of Social Security for further proceedings consistent with these findings and conclusions.

### III. MEDICAL HISTORY

Plaintiff has the complicated medical history of any person suffering from an intractable seizure disorder.  A summary of relevant portions of his medical record is provided below, but a detailed account of his treatment history is both unnecessary and beyond the scope of this recommendation.

A. <u>Treatment at UT Southwestern Medical Center: Pre-2014</u>

Plaintiff experienced his first seizure in September 2005, at 19 years of age. Tr. 56–57, 771.  He experienced another seizure in 2007 while driving, causing a vehicle collision which resulted in him sustaining serious injuries. Tr. 57–59, 631, 654. An electroencephalography ("EEG") performed later that year showed that Plaintiff's "left temporal epileptiform discharges indicate[d] a high risk for focal and/or secondarily generalized epileptic seizures."  Tr. 774.

 Plaintiff appears to have received follow-up care for his seizures at UT Southwestern Medical Center ("UTSW") from 2007 until 2014. Tr. 692–774.  The UTSW records reflect the intractable nature of his seizures as well as his Asperger's Syndrome. Tr. at 696.  These records also reflect that he experienced staring spells of unknown origin and motor tics.  Plaintiff's medication regimen included a series of different anticonvulsants, typically two at a time, which were periodically adjusted based on the level of seizure activity. Tr. 697, 700, 704, 714.  One of

his UTSW treating doctors, Dr. Mark Agostino, recommended the full seizure precautions including "no driving, no baths, no swimming, no working at heights, no work with potentially dangerous equipment and no activity that might injur[e] yourself or others if a seizure happens to occur." Tr. 699.

In 2013, a year in which Plaintiff experienced five seizures ranging from grand mal to complex partial seizures, it was suggested that Plaintiff consider being admitted to the Epilepsy Monitoring Unit ("EMU") to aid in seizure characterization and to assess whether Plaintiff might be a surgery candidate. Tr. 711, 714. In early 2014, as Plaintiff continued to experience seizures, the possibility of vagal nerve stimulator ("VNS") surgery was also broached. Tr. 726. Throughout this time, his doctors also continued to modify his medication regimen. Tr. 777. At the time, Dr. Agostino noted that Plaintiff likely had left temporal lobe epilepsy and might be a surgery candidate for a left temporal resection, but that could only be verified if he were admitted to the EMU for observation. Tr. 777–78.

B. Treatment at Billings Clinic: May to September 2014

Plaintiff was also under the care of several Montana neurologists where the family spent half the year, including Dr. Dennis O'Brien, a neurologist at the Billings Clinic. Tr. 792. Dr. O'Brien noted Plaintiff's autism and Asperger's Syndrome, as well as the nature of his seizures, which were becoming progressively difficult to treat medically. Tr. 792–93. Plaintiff's nonconvulsive seizures, consisting of staring episodes, were increasing in frequency. Tr. 793. His convulsive seizures were followed by periods of sleepiness and incoherency, which were increasing in length. Tr. 793.

Dr. O'Brien noted that while several antiepileptics had initially been effective, they lost effectiveness over time. Tr. 793. He continued to adjust Plaintiff's medication regimen and arranged for Plaintiff to undergo an MRI of the brain in May 2014, which was unremarkable. Tr. 797, 805–806, 810. However, an EEG completed the day before the MRI "was revealing for a left temporal seizure focus." Tr. 805.

During this time, Plaintiff's seizures not only continued, but increased in frequency. Tr. 805, 806. His medication was also affecting his mood and causing slurred speech. Tr. 806. His convulsive seizures eventually increased to once per week and appeared to be provoked by stress, worry, and work. Tr. 812–813. The seizures were preceded by a warning of dizziness and confusion that would last three to four minutes and followed by being "out of it" and sleepy for about a day. Tr. 813. His doctors, principally Dr. Ann Collier at the Billings Clinic, continued to modify his medication, occasionally achieving better results, but the seizures did not appear to respond to these changes for very long. Tr. 813, 917–919. His doctors also expressed that his intractable history warranted a comprehensive epilepsy workup and long-term monitoring. Tr. 816.

C. Parkland Hospital's Epilepsy Monitoring Unit: November 2014

Plaintiff was admitted to Parkland Hospital's Epilepsy Monitoring Unit ("EMU") for a 10-day in-patient observation in November 2014. Tr. 771–72. At that time, he was experiencing an increasing number of staring spells and approximately one blackout or generalized seizure per month. Tr. 771. It was noted that Plaintiff was experiencing several types of seizures – including convulsive, non-convulsive, and staring spells – the more serious of which were followed by hours-long periods of confusion and fatigue. Tr. 826–830. During the EMU admission, Plaintiff's medication was discontinued. Tr. 831. No seizures were observed while Plaintiff was at the EMU.

Tr. 772.  However, Dr. Agostini concluded that Plaintiff's EEG results were "consistent with a focal epilepsy syndrome with left temporal seizures," and again adjusted his medicine. Tr. 772, 838.

D.  University of Utah Epilepsy Monitoring Unit: February 2015

In early 2015, Plaintiff was admitted to the University of Utah's Long-Term Monitoring Unit ("LTMU"). Tr. 847.  During this admission, his medication was discontinued and he was monitored with a continuous EEG for ten days. Tr. 847.  No major seizure activity was detected. Tr. 848–49.  His diagnosis was "long standing primary generalized epilepsy with focal features, versus partial onset epilepsy with secondary bilateral synchrony, versus a mixed epilepsy."  Tr. 849.  VNS was again discussed. Tr. 849.

E.  Dr. Lindsey Consultative Physical Examination for Disability Claims: May 2015

Plaintiff was seen by Dr. George Lindsey at the Shannon Clinic in Sweetwater, Texas on May 13, 2015, for a physical examination for his disability benefits. Tr. 854.  Dr. Lindsey noted that although Plaintiff had "been on a whole plethora of pharmaceutical agents to help with seizure control," he was currently doing reasonably well now, and his last seizure was in December 2014. Tr. 855.

Dr. Lindsey found Plaintiff to be a poor historian. Tr. 856.  But relying on the records from UTSW and Parkland, Lindsey confirmed that Plaintiff had failed multiple anti-seizure medications and continued to have seizures. Tr. 856.  His ultimate diagnostic impressions were: (1) epilepsy with focal seizures that were now improved on the current double medication program; (2) medical history notable for Asperger's Syndrome; and (3) cervical spine fracture, 2007 motor vehicle

9

accident and multiple fractures of the right foot. Tr. 856.  Dr. Lindsey did not provide any specific assessment regarding Plaintiff's ability to work.

F.  Dr. Rudolph Consultative Mental Examination for Disability Claims: May 2015

On May 21, 2015, Plaintiff was seen by Dr. Charles Rudolph, Ph.D. for a consultative mental evaluation for his disability determination. Tr. 861.  Plaintiff and his family noted that problems from his Asperger's started in preschool but that he was not diagnosed until the seventh grade. Tr. 862.  Plaintiff also reported experiencing relationship difficulties. Tr. 862.  Plaintiff reported the seizures as occurring two to three times a year, much less frequent now that he is taking medication. Tr. 862.  Plaintiff reported that his daily activities include helping with chores and occasionally going to the movies and church. Tr. 862.

Dr. Rudolph noted that Plaintiff's abstract thinking was below average. Tr. 863.  His score on the Mini Mental Status Examination was in the "normal range of cognitive functioning."  Tr. 863.  Dr. Rudolph observed that Plaintiff was able to remember the name of the examiner as well as the current president and three other presidents. Tr. 863.  Plaintiff was able to recall three unrelated objects immediately and after a short delay and he could repeat four digits forward and backward. Tr. 863.  Additionally, he quickly calculated Serial 7's and was able to spell "WORLD" forward and backward. Tr. 863.

Dr. Rudolph's diagnosis was "Autism Spectrum Disorder, With Accompanying Intellectual Impairment" and he determined that Plaintiff's "ability to make personal, social and occupational adjustments is significantly impaired."  Tr. 864.  He determined that his insight was poor and that Plaintiff's "ability to sustain concentration, persist in work-related activity or be

10

effective in social interaction with supervisors, co-workers, and the public or to deal with normal pressures in a work setting is significantly impaired."  Tr. 864.

G.  SAMCs' Reports for Initial Disability Decision: June 2015

Plaintiff's medical records were reviewed by state agency medical consultants ("SAMCs"). *See* Exhibits 1A, 12A (Tr. 72–86, 127–141).  Absent from the medical records reviewed by the SAMCs were the Billings Clinic records. Tr. 73–75.  Dr. Patty Rowley, MD, noted impairments in a physical RFC assessment dated June 10, 2015. Tr. 79–82.  Consistent with the medical records she reviewed, Dr. Rowley's physical RFC assessment was for the period of May 27, 2014, to the date of the decision (June 10, 2015). Tr. 79.  In evaluating Plaintiff's seizure disorder, she found that Plaintiff would be limited to light exertional work with no more than occasional climbing of ramps and stairs, stooping, crouching, and crawling. Tr. 80.  Plaintiff also could never climb ladders, ropes, or scaffolds and must avoiding concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and any hazardous conditions, including machinery and heights. Tr. 80–81.

Additionally, Dr. Michael O'Callaghan, Ph.D., reviewed Plaintiff's medical records to determine whether Plaintiff had a Medically Determinable Impairment ("MDI") and found that Plaintiff had the impairments of epilepsy and autistic disorders. Tr. 77–78.  He applied the Psychiatric Review Technique ("PRT") for the periods of November 17, 2014, to the date of decision (June 10, 2015). Tr. 78.  Evaluating Plaintiff's symptoms under Listing 12.10 "Autistic Disorder and Other Pervasive Development Disorders," Dr. O'Callaghan found that Plaintiff's impairment did not satisfy the "A" criteria of the listings. Tr. 78.  Under the "B" criteria, Dr. O'Callaghan found that Plaintiff had a mild restriction of activities of daily living, moderate

difficulties in maintaining social functioning, moderate difficulties in maintaining concentation, persistence or pace, and no repeated episodes of decompensation. Tr. 78.

Dr. O'Callaghan provided a mental RFC assessment for the period of November 17, 2014 to June 9, 2015, and found that Plaintiff would be moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; work in coordination with others or in proximity to others without being distracted by them; and complete a normal workday or workweek without interruption from his psychologically-based symptoms or perform at a constant pace. Tr. 82–84. With respect to Plaintiff's social interactions, Dr. O'Callaghan found that Plaintiff would be moderately limited in his ability to interact appropriately with the general public. Tr. 83. Dr. O'Callaghan ultimately concluded that Plaintiff "can understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately w/co-workers and supervisors, and respond appropriately to routine work settings." Tr. 84.

H. SAMCs' Reports for Reconsideration of Disability Decision: August 2015

On August 21, 2015, Plaintiff's medical records were reviewed by different SAMCs as a part of the reconsideration process. *See* Exhibits 8A, 9A (Tr. 93–124). Dr. Roberta Herman, considering the time period of May 27, 2014 through the date of decision (August 21, 2015), determined that Plaintiff's physical RFC was the same as that decided by Dr. Rowley and that Plaintiff would be limited to light work with additional precautions. Tr. 101–104. For the reconsideration decision, the Billings Clinic records were added to the file but Dr. Herman's RFC is identical to Dr. Rowley's and includes no reference to these records. *See* Tr. 102–104.

Dr. Jean Germain, Ph.D., completed another PRT assessment for Listing 12.10 Autistic Disorder. Consistent with the initial determination, Dr. Germain found a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. Tr. 99. Dr. Germain also completed a mental RFC for November 17, 2014, to the date of decision (August 21, 2015) and this RFC showed some variation from the initial determination. Tr. 104–106. While confirming the majority of initial findings, including that Plaintiff would be moderately limited in his ability to understand and remember detailed instructions, Dr. Germain found that Plaintiff was not significantly limited with respect to his ability to maintain attention and concentration for extended periods, or perform activities within a schedule, or maintain regular attendance or be punctual. Tr. 104–105. She also found that Plaintiff was not significantly limited in his ability to work in coordination with or in proximity to others without being distracted by them. Tr. 105. At the same time, Dr. Germain *did* find that Plaintiff had adaptational limitations, including a moderate limitation in his ability to respond appropriately to changes in the work setting. Tr. 105. Dr. Germain concluded that Plaintiff could "understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact [with] others, and respond to changes." Tr. 106.

I. Treatment at Billings Clinic: Mid to Late 2015

Dr. Collier saw Plaintiff again in Billings several times during 2015, on one occasion noting that the results of the in-patient monitoring showed that he was not a surgical candidate. Tr. 901. Although Plaintiff reported that he was doing much better and Dr. Collier considered his

condition to be "relatively well controlled" (Tr. 877), he continued to have seizures.  Tr. 901, 957–958, 1396, 1412.

J.  Letter from Dr. Gutierrez: April 2016

In April 2016, Dr. Arnoldo Gutierrez, provided a one-page letter stating that he had known Plaintiff for approximately 12 years and that, due to Plaintiff's Asperger's Syndrome, he required direction and help when working and could only work on one project at a time. Tr. 977. Dr. Gutierrez also observed that because of his seizures, Plaintiff was unable to drive himself to work anyplace other than his parents' properties. Tr. 977.

K.  Dr. Brinkman Neuropsychological Evaluation: May 2016

Plaintiff had a neuropsychological consultation and evaluation with Dr. Samuel Brinkman, Ph.D. on May 3, 2016. Tr. 979–85.  Dr. Brinkman noted that Plaintiff received special education services throughout his schooling and that a previous assessment by his school district in 2005 had yielded a full-scale IQ of 68. Tr. 985.  Dr. Brinkman's impressions were that Plaintiff "has been experiencing increased difficulty with medically refractory seizures and possible short-term memory loss."  Tr. 985.

Dr. Brinkman tested Plaintiff's abilities in light of his seizures and Asperger's Syndrome using a variety of standardized procedures. Tr. 980.  Plaintiff demonstrated a full-scale IQ of 72, with a verbal comprehension score or 72, perceptual reasoning score of 77, working memory score of 66, and processing speed score of 94, putting Plaintiff's intellectual abilities in the borderline range. Tr. 980–81.  Dr. Brinkman concluded that while Plaintiff had a "low normal ability to communicate concrete information in a meaningful and functional way" in unstructured

14

conversation, he demonstrated normal ability in the functional and pragmatic parts of speech and communication. Tr. 981.

Dr. Brinkman also tested Plaintiff's memory and learning capabilities. Tr. 982. In auditory learning, Dr. Brinkman noted that Plaintiff demonstrated "severely below normal immediate recall, severely below normal transfer of information from short term to long term memory, and severely below normal retrieval of information from long term memory." Tr. 982. In addition, Plaintiff's "[i]mmediate recall of visual information was within below normal limits, as was delayed recall of the previously learned visual information." Tr. 982.

Dr. Brinkman ultimately concluded the following:

[Plaintiff] has borderline intellectual functioning, generally consistent with his abilities while he was in school. Academic skill development is limited. Memory functioning is significantly below average, and one of the key characteristics of his memory functioning is its inherent variability due to the seizure disorder. While he may demonstrate fair recall at times, the occurrence of non-convulsive seizure activity (as documented in his EEGs) disrupts consolidation of the memory trace and makes it unlikely that he will be able to retain information, instructions, and procedures well enough to be competitively employable. Similarly, as is commonly seen in seizure disorders, attentional functioning is very poor.

[Plaintiff] has a history of Asperger's disorder documented since early childhood. This disorder makes it very difficult to manage the interpersonal and relational aspects of the work place.

Tr. 983.

L.  Treatment at Billings Clinic and Implantation of VNS: 2016

Plaintiff continued to experience seizures in 2016, and while Dr. Collier noticed a decrease in frequency, her ultimate impression was the Plaintiff's seizure disorder did not respond well to treatment. Tr. 1396, 1412–1415. In August 2016, Dr. Eugene Dolan, a neurosurgeon at the Billings Clinic, noting Plaintiff's intractable seizures and their continued multifocality, implanted the VNS

device. Tr. 1170–72, 1391.  Through a combination of the VNS and medication adjustments, Plaintiff experienced several seizure-free months in late 2016, but did have one grand mal in September of that year. Tr. 994, 1001, 1006, 1011–1012, 1016, 1018, 1022, 1040.

M.  Treatment by Dr. Du: January to March 2017

Plaintiff's seizure disorder was monitored by Dr. Antao Du during the winter of 2017.  Tr. 1429, 1434.  Dr. Du noted that while his seizures were much improved with the VNS, his seizures continued. Tr. 1429, 1434, 1442.  Dr. Du's impression was that Plaintiff had generalized convulsive epilepsy, with intractable epilepsy and that his seizures were "very intractable."  Tr. 1431.  Dr. Du noted that Plaintiff's Asperger's syndrome hampered Plaintiff's ability to describe the details of his seizures. Tr. 1431.

IV. ADMINISTRATIVE HEARING AND ALJ DECISION

A. Plaintiff's Testimony

As noted above, the hearing before the ALJ was held on June 7, 2017.  Plaintiff testified that he had about a year and half of in a college welding program. Tr. 33. Plaintiff's last employment was at a bed and breakfast owned by a family friend in October 2013. Tr. 34.  His parents support him and he works for them at their ranch. Tr. 34.  There, he cleans stalls, waters and feeds horses, helps saddle and unsaddle horses, mows and trims, and helps his mother cook. Tr. 35.  He works about 50 hours a week. Tr. 36.  He is able to lift a bale of hay himself, which he guessed weighed about 100 pounds or more. Tr. 36.

He has done such work for his parents "pretty much always" including in 2008. Tr. 37. Usually, he knows what his mother and father want him to do because he has been doing it so long. Tr. 50.   After lunch he naps for a couple hours due to his seizures. Tr. 50–51.  Lack of sleep and

stress trigger his seizures. Tr. 51. He would become stressed when things change, when he was not able to get something done, and when he was required to meet a deadline. Tr. 52.  Plaintiff lives in Montana with his family half of the year at their house. Tr. 53.

For recreation he watches television and movies, listens to music, and likes doing word puzzle books. Tr. 53–55.  He has also been reading Lonesome Dove. Tr. 54.

Plaintiff's seizures are the main medical condition that interferes with his ability to work. Tr. 37.  Before the hearing, the last time he had experienced a seizure was one month prior. Tr. 37. The year of the hearing (2017), Plaintiff believed he had three seizures, each time losing consciousness. Tr. 38.  He had four seizures in 2016 and four in 2015. Tr. 39.  Plaintiff's last visit to the emergency room that resulted from a seizure occurred when his car accident happened, in March of 2007. Tr. 40–41.

Plaintiff confirmed that since implantation of the VNS, his seizures are fewer and shorter. Tr. 41. Before the VNS he was having "lots of seizures, like probably every week or two weeks." Tr. 56.  During that time, he was on medication, but it was not "kicking in" or working. Tr. 56.

Plaintiff confirmed that he worked doing odd jobs at a family friend's bed and breakfast in 2013. Tr. 44–45.  For two summers he worked for another family friend, but he had trouble remembering "what tools is what" and found it hard. Tr. 48.

B. VE Testimony

During the vocational expert's ("VE") testimony, the ALJ asked the VE to consider a hypothetical younger individual who was a high school graduate with the same work history as Plaintiff. Tr. 60.  The ALJ's hypothetical question to the VE was as follows:

> The individual can lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently. The individual can sit, stand, or walk, individually or in combination,

throughout an eight-hour work day and otherwise perform the full range of light work but with these additional limitations: The individual can only occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs. The individual must follow seizure precautions, including, one, no exposure to hazards, such as unprotected dangerous machinery; two, no working at unprotected heights, including no climbing ladders, scaffolds, or ropes; and, three, no driving. The individual requires a generally clean environment and so must avoid concentrated exposure to airborne contaminants, such as dust, fumes, and mold, but working in a climate-controlled environment, including a normal office environment, is allowed. The individual is limited to simple work, specifically to occupations with a reasoning development level of 1 or 2 as defined in the Dictionary of Occupational Titles, and the individual can have no more than superficial interaction with the public.

Tr. 60–61. With such an RFC, the VE confirmed that the individual could not perform any of Plaintiff's past work. Tr. 61. However, the VE indicated that a number of jobs in the national economy existed that would be limited to light work, including office helper, inspector packer, and bench assembler. Tr. 61–62.

Upon questioning from the Plaintiff's attorney, the VE confirmed that if a person was unable to remember and carry out the instructions of even simple work over an extended period of time, they would not be able to perform the listed occupations or other simple work. Tr. 63.  The VE further confirmed that if someone was walking away from the work, even just ten percent of the time, such an individual could not do the work. Tr. 64.

C. ALJ Decision

With respect to both benefit applications, Plaintiff's alleged onset of disability was June 30, 2008.  In reviewing Plaintiff's application for DIB under Title II, the ALJ considered whether Plaintiff was disabled on June 30, 2008.  In considering Plaintiff's application for disability under Title XVI, the ALJ considered whether Plaintiff was disabled on January 8, 2015, the date of application.  Ultimately, the ALJ found that Plaintiff was not disabled on June 30, 2008, or from January 8, 2015, through the date of decision (November 13, 2017). Tr. 20.

18

In issuing his decision, the ALJ followed the five-step sequential process under 20 C.F.R. § 416.920(a)(4). Under Step 1, the ALJ found that Plaintiff did not engage in substantial gainful activity on June 30, 2008 (the alleged onset date) or on January 8, 2015. Tr. 13. Under Step 2, the ALJ found that the claimant had the severe impairments of epilepsy, a cognitive disorder secondary to seizure disorder, Asperger's disorder, and Autism Spectrum Disorder with accompanying intellectual impairment. Tr. 13. The ALJ found that the impairments did affect Plaintiff's ability to work and were "severe" under the *de minimis* standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). Tr. 13.

At Step 3 of the analysis, the ALJ determined that Plaintiff's impairments did not meet or medically equal the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 13. In reaching this conclusion, the ALJ gave "very significant weight" to the opinions of the SAMCs. Tr. 13. With respect to Plaintiff's seizure disorders, the ALJ specifically considered section 11.02 (concerning epilepsy) and section 11.00 (concerning neurological disorders) of Appendix 1. Tr. 13. With respect to Plaintiff's mental impairments, the ALJ considered section 12.02 and 12.10. Tr. 13.

In analyzing Plaintiff's alleged mental impairments under 12.02 or 12.10, the ALJ considered whether the "paragraph B" criteria were satisfied. Tr. 13. The ALJ found that Plaintiff had: a mild limitation in his ability to understand, remember, or apply information; a moderate limitation in interacting with others; a moderate limitation regarding concentrating, persisting, or maintaining pace; and a mild limitation in his ability to adapt or manage oneself. Tr. 14.

Upon finding that Plaintiff's severe impairments did not meet the requirements of the Listings, the ALJ determined Plaintiff's RFC. Tr. 15. The ALJ determined that:

For the relevant periods at issue, the claimant had no limits physically and could perform the full range of work, except: The claimant was required to follow seizure precautions, including: (1) no exposure to hazards, such as unprotected dangerous machinery; (2) no working at unprotected heights, including no climbing ladders, ropes, or scaffolds; and (3) no driving. He was limited to simple work, specifically to occupations with a reasoning development level of 1 or 2 (as defined in the Dictionary of Occupational Titles), and he could have no more than superficial interaction with the public.

Tr. 15.

The ALJ only considered the respective dates of June 30, 2008, the alleged onset date, and the period of January 8, 2015, up to the date of decision. Tr. 16. In fashioning the RFC, the ALJ first cited to Plaintiff's testimony at the hearing. Tr. 16. He noted that Plaintiff had three seizures so far in 2017 (the hearing was held in June), four in 2016, and four in 2015. Tr. 15. He noted Plaintiff's current medications, that the VNS was implanted in the summer of 2016, and that the seizures did not last as long as before. Tr. 15. He noted Plaintiff's testimony regarding his daily activities, in particular that he works 50 hours a week doing chores and has hobbies. Tr. 16.

The ALJ declined to give controlling weight to any of the opinions of Plaintiff's treating physicians or consulting examining physicians regarding his physical (or mental) impairments. In considering the effects of Plaintiff's seizure disorder, the ALJ relied upon Plaintiff's self-reported statement during his psychological examination that he experienced only two to three seizures a year. Tr. 16. The ALJ cited the progress notes from Plaintiff's appointment on July 22, 2015 (with Dr. Collier), stating that Plaintiff was doing better than he had been the previous summer and that he did not want to change his medications. Tr. 16. The ALJ likewise cited treatment notes from the September 2, 2015, appointment with Dr. Collier, indicating that Plaintiff had "exceptional seizure control" as well as progress notes from September 22, 2016, in which Dr. Riggins noted that Plaintiff had experienced a seizure in May but was otherwise doing "fantastic." Tr. 16. With

respect to his findings on Plaintiff's seizures, the ALJ did not cite to the medical evidence in the record from before July 2015, including the treatment records from UTSW, Parkland Hospital, or the University of Utah.

With respect to Plaintiff's physical limitations, the ALJ concluded that "[t]he evidence did not support the finding of any limitations with regard to performing work related exertional activities such as sitting, standing, walking, lifting, carrying, pushing, or pulling, and the evidence did not support the finding of any postural, manipulative, visual, or communication limitations." Tr. 17. The ALJ found some environmental and mental limitations based on the seizure activity, mental impairments, and treatment records. Tr. 17. In reaching this conclusion, the ALJ noted that he considered the opinion evidence in the case. Tr. 17. He gave "some weight" to the SAMCs' opinions, but rejected their RFC assessments limiting Plaintiff to light work with postural and environmental limitations. Tr. 17.

In considering the effects of Plaintiff's mental symptoms, the ALJ found that the evidence did not support disabling limitations beyond those in the RFC. The ALJ considered the examination by Dr. Rudolph, but gave little weight to the opinion that Plaintiff's ability to sustain concentration, persist in work-related activity, be effective in social interaction, or deal the normal pressures in a work setting was significantly impaired. Tr. 17. The ALJ likewise gave no weight to Dr. Brinkman's opinion that Plaintiff's functioning was such that he was unemployable. Tr. 17. The ALJ also considered the letter submitted by Dr. Arnoldo Gutierrez, but found his opinions unhelpful, and so he gave them very little weight. Tr. 17. But ALJ incorporated Dr. Gutierrez's observation that Plaintiff should not drive. Tr. 17.

The ALJ also considered the third-party statements of Plaintiff's father, family friends, former employers, and a former teacher. Tr. 17–18.  Two of the third-party statements were made by Plaintiff's two sole employers outside the home. While the ALJ acknowledged that these statements included observations that Plaintiff was easily distracted, had frequent seizures, and was not able to maintain full-time employment, he gave the third-party statements limited weight. Tr. 18.  The ALJ noted that these individuals were not medically trained to make "exacting" observations and the accuracy of the statements was questionable. Tr. 18.

Ultimately, the ALJ found that Plaintiff's subjective complaints and limitations were not consistent with his admitted abilities, conservative treatment records, and "largely stable" clinical findings. Tr. 18.

At Step 5, the ALJ concluded that based on Plaintiff's age, education, work experience, and RFC, there were jobs that exist in substantial numbers in the national economy that Plaintiff could perform. Tr. 18.  As noted above, the ALJ asked the vocational expert to consider the more restricted hypothetical with Plaintiff's age, education, and work experience who could only perform light work. Tr. 19.  The vocational expert testified that this individual would be able to perform the occupations of office helper, inspector-packer, and bench assembler. Tr. 19.  Although the ALJ had determined that Plaintiff was capable of the full range of work at all exertion levels, the ALJ found that this difference was not outcome determinative because occupations were available even for light work. Tr. 19.  Accordingly, the ALJ found Plaintiff not disabled during the relevant periods. Tr. 19–20.

V. ANALYSIS

Plaintiff challenges the ALJ's decision on the following grounds: (1) the ALJ's RFC is not supported by substantial evidence and (2) the ALJ erred in failing to evaluate Plaintiff's intellectual functioning under Appendix 1 Listing 12.05(B) (Intellectual Disorder). The undersigned finds that Plaintiff's first point of error has merit, and therefore recommends the Court remand the case for further administrative hearings.

A. The ALJ's RFC determination is not supported by substantial evidence.

In arguing that the ALJ's decision is not supported by substantial evidence, Plaintiff makes several arguments, including that that the ALJ did not base his RFC assessment upon any medical opinion of record. Because the undersigned finds that substantial evidence does not support the ALJ's RFC assessment due to a lack of relevant medical opinion evidence, Plaintiff's other arguments will not be examined in full.

1. The Parties' Positions

Among other arguments, Plaintiff contends that the ALJ failed to base his RFC assessment on any medical opinion of record. Dkt. No. 16 at 16. Plaintiff argues that the ALJ discounted the conclusions made by all treating, examining, or non-examining medical sources and instead based the RFC on the ALJ's own lay intuitions about the medical evidence and his own inferences about Plaintiff's functional capabilities. *Id*.

Plaintiff specifically notes that the ALJ rejected the SAMCs' conclusions that Plaintiff would be limited to light exertional work with postural and environmental limitation (i.e. that Plaintiff avoid concentrated exposure to fumes, odors, gases, and poor ventilation). *Id*. Further, Plaintiff notes that the ALJ rejected the opinion of the consultative examiner Dr. Rudolph who

stated that, due to Plaintiff's Asperger's, he would be "significantly impaired" in his ability to sustain concentration, persist in work-related activity, effectively interact with supervisors, co-workers, and the public and handle normal pressures in a work setting. *Id*. The ALJ likewise rejected the opinion of consultative examiner Dr. Brinkman, which stated that due to Plaintiff's mental limitations and seizure activity, he would not likely be able to retain information, instructions, and procedures well enough to be competitively employable. *Id*. at 17. Plaintiff also takes issue with the fact that the ALJ rejected the opinions of Dr. Gutierrez that Plaintiff required direction while working and could only do one project at a time. *Id*.

The Commissioner responds by arguing that the ALJ is not required to base the RFC finding on a medical opinion. Dkt. No. 17 at 8. He argues that the ALJ in this case properly assessed Plaintiff's RFC under the relevant regulations and Social Security Rulings by considering all the relevant evidence, including medical evidence. *Id*. According to the Commissioner, Plaintiff's position amounts to an argument that the ALJ's RFC finding should have mirrored a medical opinion. *Id*. The undersigned disagrees.

## 2. The RFC and *Ripley*

An individual's RFC is the most an individual can do despite his limitations or restrictions. *See* 20 C.F.R. § 404.1545(a)(1). An RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1, 3–5 (S.S.A. July 1, 1996). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945." *Id*. at *1. Paragraphs (b), (c), and (d) relate to physical,

mental, and other abilities. When assessing mental impairments, the ALJ considers evidence of the claimant's abilities to understand, remember, and carry out instructions, as well as respond appropriately to supervision, co-workers, and pressures in a work setting. 20 C.F.R. § 404.1545(c). The ALJ uses the "paragraph B criteria" to rate the severity of the claimant's mental limitations in the following functional areas: (1) understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id*. § 404.1520a(c)(3); *see id*. Part 404, Subpart P, Appendix 1. Additionally, the ALJ considers limitations and restrictions that affect other work-related abilities. 20 C.F.R. § 404.1545(d).

"It is the responsibility of the ALJ to interpret 'the medical evidence to determine [a claimant's] capacity for work.' " *Fontenot v. Colvin*, 661 F. App'x 274, 277 (5th Cir. 2016) (per curiam) (quoting *Taylor v. Astrue,* 706 F.3d 600, 603 (5th Cir. 2012). "[T]he ALJ is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly." *Id*. (brackets in original) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990) (per curiam)). The ALJ's RFC assessment is to be based upon "*all* of the relevant evidence in the case record," including, but not limited to, "medical history, medical signs, and laboratory findings; the effects of treatment; and reports of daily activities, lay evidence, recorded observations, and work evaluations." *Eastham v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-2001-L, 2012 WL 691893, at *6 (N.D. Tex. Feb. 17, 2012) (citing SSR 96-8p).

The ALJ is responsible for resolving any conflicts in the evidence. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (per curiam). Further, "[t]he ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record." *Ewing v.*

*Colvin*, No. 4:13-CV-085-A, 2014 WL 2464765, at *4 (N.D. Tex. June 2, 2014) (citing *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991)).  Likewise, the ALJ is not required to expressly state in the RFC the limitations on which it is based.  *Cornejo v. Colvin*, No. EP-11-CV-470-RFC, 2013 WL 2539710, at *9 (W.D. Tex. June 7, 2013) (citing *Bordelon v. Astrue*, 281 F. App'x 418, 422–23 (5th Cir. 2008) (per curiam)).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.

Nevertheless, the ALJ must rely on medical opinions in the record in order for his RFC assessment to be supported by substantial evidence.  *Ripley*, 67 F.3d 557 (5th Cir. 1995); *see also Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009). "[A]n ALJ may not—without opinions from medical experts—derive the applicant's [RFC] based solely on the evidence [of the claimant's] claimed medical conditions. Thus, an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Williams*, 355 F. App'x at 832 n. 6 (citing *Ripley*, 67 F.3d at 557).  "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

In *Ripley*, the Fifth Circuit remanded a case for additional proceedings where it found that although the "record include[d] a vast amount of medical evidence establishing that [the claimant] has a problem with his back" there was no report from a treating physician regarding the claimant's

ability to work. 67 F.3d 557. While the Court noted that the lack of a medical source statement does not itself render a record incomplete, because the record did not otherwise clearly establish "the effect claimant's condition had on his ability to work," the ALJ's decision denying benefits was not supported by substantial evidence. *Id.* The Fifth Circuit later reiterated the *Ripley* principle in *Williams*, 355 F. App'x at 832 n.6. In that unpublished case, the Fifth Circuit held that while an ALJ is entitled to assign non-controlling weight to a treating physician's opinion, the ALJ may not rely on his own medical opinions regarding the limitations presented. *Id.* at 831–32.

       3. Substantial evidence does not support the ALJ's RFC assessment.

       In assessing a plaintiff's challenge on substantial evidence grounds, the Court must "scrutinize the record in its entirety to determine whether substantial evidence does indeed support the [Commissioner's] findings" *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) (*citing Ransom v. Heckler*, 715 F.2d 989, 992 (5th Cir. 1983)). The record in this case includes a vast amount of evidence establishing that Plaintiff had epilepsy with intractable seizures and Asperger's syndrome or Autism Spectrum Disorder. But in this case, as in *Ripley*, the undersigned finds that this record did not clearly establish the effect that Plaintiff's physical disabilities had on his ability to work, and therefore any conclusion reached by the ALJ on this issue is not supported by substantial evidence.

       As noted above, the ALJ found that Plaintiff had the "severe impairments" of epilepsy, a cognitive disorder secondary to seizure disorder, Asperger's disorder, and Autism Spectrum Disorder with accompanying intellectual impairment. And although the ALJ did not find that the impairments were severe enough to equate to one of the Listings, he was required to determine Plaintiff's RFC in light of those impairments. Indeed, as noted by the ALJ in his decision, in

determining Plaintiff's ability to perform physical and mental work activities on a sustained basis, he was required to consider the limitations resulting from all of Plaintiff's impairments, even those not deemed "severe." *See* Tr. 12 (citing 20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945, and SSR 96-8p)).

But despite the vast amount of evidence in this case, there are significant gaps in the record, especially in the available medical opinion evidence. No treating source opines on the effects of Plaintiff's physical or mental disabilities on his ability to work. And although two consultative examining physicians, Drs. Rudolph and Brinkman, provided assessments regarding Plaintiff's ability to work, those assessments were limited to the effects of Plaintiff's *mental* impairments. Accordingly, the ALJ was left to base his physical RFC solely on the medical opinions provided by the non-examining SAMCs, and those assessments were insufficient for the reasons explained below.

With respect to Plaintiff's epilepsy, none of numerous neurologists, including epileptologists, who closely monitored and treated Plaintiff for his epilepsy over the years provided an assessment regarding how Plaintiff's seizure condition affected his physical ability to work. This is notable because, as evident from the record, these medical professionals were the ones from whom Plaintiff received most of his medical care. And although Plaintiff would draw the Court's attention to the letter submitted by Dr. Gutierrez, and refers to him as a "treating physician" in his Reply, neither Plaintiff nor Dr. Gutierrez provided any supporting documentation indicating the presence of an ongoing treating relationship, nor was he regarded by the ALJ as such. And, because Plaintiff did not appear to receive any treatment for his Asperger's or other intellectual

disabilities after leaving school, there are no relevant opinions from treating sources evaluating the effects of those limitations either.

Second, the undersigned notes that the record contains reports completed by three consultative examining physicians: Dr. Lindsey, Dr. Rudolph, and Dr. Brinkman. But none of those reports directly considered the physical limitations of Plaintiff's seizure disorder on his ability to work. While Dr. Lindsey verified Plaintiff's impairments, including the epilepsy, he did not opine regarding the effects of the epilepsy on Plaintiff's ability to work. Further, his opinion was not one cited by the ALJ in his decision.

Dr. Rudolph, as a consultative examiner on Plaintiff's *mental* abilities, did provide an opinion regarding Plaintiff's ability to work, specifically finding that Plaintiff's ability to sustain concentration, persist in work-related activity, be effective in social interaction, or deal the normal pressures in a work setting was significantly impaired. Tr. 17.  But Dr. Rudolph's sole diagnosis was "Autism Spectrum Disorder, With Accompanying Intellectual Impairment" and he appears to have based his recommendation only on that diagnosis, with no further comment on the complicating physical effects of Plaintiff's seizure disorder.  And even that assessment was given little weight by the ALJ in fashioning Plaintiff's mental RFC.  As noted above, the ALJ did consider the opinion of Dr. Rudolph and cited specific data points from the report (e.g. that Plaintiff could spell "world" backward) when he evaluated Plaintiff's mental functioning under each of the paragraph B criteria.  But the ALJ found that Dr. Rudolph's ultimate assessment was "too general, did not detail any specific work-related limitations the claimant may have had, was not supported by the claimant's treatment records, and did not explain the basis for these conclusions." Tr. 17.

29

Dr. Brinkman's examination, like Dr. Rudolph's, was limited to a *mental* evaluation of Plaintiff. As noted above, Dr. Brinkman provided a comprehensive neuropsychological consultation, including an assessment regarding how Plaintiff's *mental* abilities were impaired by both Plaintiff's seizure disorder and Asperger's/Autism Spectrum Disorder and the effects of these mental limitations on his ability to work. Although, even as a mental assessment, the ALJ found reasons to discount Dr. Brinkman's opinions, citing the Brinkman report only once in his assessment of the paragraph B criteria. The ALJ did not cite to most of Dr. Brinkman's test results or his observations that Plaintiff's "[m]emory functioning is significantly below average, and one of the key characteristics of his memory functioning is its inherent variability due to the seizure disorder" or that "[w]hile he may demonstrate fair recall at times, the occurrence of non-convulsive seizure activity (as documented in his EEGs) disrupts consolidation of the memory trace and makes it unlikely that he will be able to retain information, instructions, and procedures well enough to be competitively employable." Tr. 983. The ALJ only directly addressed the latter component of the second statement on the grounds that employability was an assessment reserved for the Commissioner. Nevertheless, while the ALJ partially relied on and rejected Drs. Brinkman's and Rudolph's opinions in fashioning Plaintiff's mental RFC, no analogous consultative examining report existed assessing the impact of Plaintiff's *physical* impairments on his ability to work.

The only remaining medical opinion evidence available to the ALJ as he fashioned the Plaintiff's RFC were the assessments provided by the SAMCs as non-examining sources. Separate SAMCs assessed Plaintiff's physical and mental abilities for the initial decision and reconsideration, amounting to four total reports. Nevertheless, because of the lack of other relevant

30

medical opinion evidence as noted above, this means that the assessments provided by Drs. Rowley and Herman, who assessed Plaintiff's physical RFC at the state agency level, provided the only medical opinions in the record that directly analyzed the physical limitations brought about by Plaintiff's seizure disorder.

The ALJ did not cite directly to the opinions of the SAMCs in fashioning either the mental or physical RFCs. The ALJ concurred with the SAMCs insofar as they determined that Plaintiff's impairments did not meet a Listing. Tr. 13. As to Plaintiff's mental impairments, the ALJ did not cite to the SAMCs' paragraph B assessments, which although largely consistent in their respective findings (mild, moderate, moderate, mild), were made using the different criteria in effect under the prior versions of the regulations. But as to Plaintiff's RFC, the ALJ's engagement amounted to a general statement that he gave some weight to the initial and reconsideration SAMCs' opinions. However, the ALJ concluded, he ultimately saw no basis to limit Plaintiff to light work or for the assessed postural and environmental limitations (although he did include seizure precautions).

Accordingly, without support from medical opinion evidence from either treating or examining physicians, and after giving some weight to the reports from the SAMCs, the ALJ determined that Plaintiff's impairments allowed him to do the "full range of work," with seizure precautions, but that he would be limited to simple work with no more than superficial interaction with the public. By imposing certain cognitive limitations, it appears the ALJ attempted to account for Plaintiff's Asperger's and Autism Spectrum Disorder. By imposing certain seizure precautions, it appears the ALJ attempted to capture the limitations of his epilepsy. The problem with the ALJ's approach is that the record lacks medical evidence to support his physical RFC determination and

this violates the Fifth Circuit's holding in *Ripley*. While the ALJ's mental RFC assessment was arguably based on a questionable selection of evidence from the record as noted above, the record did contain medical opinion evidence from consultative examining physicians Dr. Rudolph and Dr. Brinkman regarding the effects of Plaintiff's mental impairments on his ability to work, even though the ALJ rejected those conclusions.

But the only medical opinion evidence available to the ALJ when he made his physical RFC assessment that Plaintiff could perform the "full range of work," despite having a seizure disorder, were the assessments of the SAMCs. And those SAMCs found that Plaintiff should be limited to light exertional work.

SAMCs such as Drs. Rowley and Herman are considered experts in Social Security Disability determination and their opinions may be entitled to great weight if they are supported by the evidence. *Hardin v. Astrue*, No. 3:10-CV-1343-B, 2011 WL 1630902, at *7 (N.D. Tex. Mar. 31, 2011), *report and recommendation adopted,* 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011). An ALJ may meet the requirements under *Ripley* by relying on an SAMC's findings. *Coffelt v. Berryhill*, 2017 WL 6508993, at *4 (N.D. Tex. Nov. 1, 2017), *adopted by* 2017 WL 6498009 (N.D. Tex. Dec. 19, 2017); *see also Young v. Berryhill*, 2017 WL 946323, at *12 (N.D. Tex. Feb. 13, 2017) ("Because the ALJ relied on the medical opinions of [the SAMCs] to determine Plaintiff's limitations, he did not independently decide the effects of Plaintiff's impairments[.]"), *adopted by* 2017 WL 931228 (N.D. Tex. Mar. 9, 2017).

Nevertheless, in this case, the medical opinions of the SAMCs were not a sufficient basis on which the ALJ could solely rely for the physical RFC assessment for the time periods in question. In particular, Dr. Rowley's physical RFC assessment was limited only to the period of

May 27, 2014, to the date of decision (June 10, 2015). Tr. 79. She found that the medical history prior to the date insufficient. Tr. 81. And she did not have before her any of Plaintiff's treatment records from the neurologists monitoring his care at the Billings Clinic.

Likewise, the identical physical RFC signed off on by the second SAMC on reconsideration, Dr. Roberta Herman, only covered the time period of May 27, 2014, through the date of decision (August 21, 2015). And although the records from the Billings Clinic were supposedly added to the file, none of the evidence from those medical records appears to be referenced in Dr. Herman's identical RFC explanation. *See* Tr. 102–104.

In contrast to the limited time spans covered by the SAMCs' medical opinions, the ALJ made his RFC assessment with respect to two separate time periods. He found that for both relevant periods "there was no evidence of an impairment so significant as to interfere with the performance of the range of work at all exertional levels described in the above residual functional capacity finding, through June 30, 2008, and from January 8, 2015, through the present." Tr. 18. And although he attempted to distinguish the two dates,[4] his findings of "severe" impairments and the subsequent RFC were made with respect to both time periods in question, from the alleged onset date of June 30, 2008, and from January 8, 2015, to the date of decision.

Because the record does not contain relevant medical opinion evidence describing the physical effect Plaintiff's epilepsy had on his ability to work for the bulk of the alleged disability period, the ALJ should have obtained a medical source opinion. Even if the Court afforded the

---

[4] The ALJ noting that "After careful consideration of the evidence, I found that the claimant's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not consistent with or supported by the medical evidence and other reliable evidence through June 30, 2008. From January 8, 2015, through the present, the claimant's allegations were supported in the sense that he is limited, but not disabled." Tr. 16.

ALJ great deference in his RFC assessment that Plaintiff could perform a full range of work for the limited 2014 to 2015 period (which was made contrary to the only medical opinions on this issue: the SAMCs who assessed a limitation to light work), there are no medical opinions in the record that opine on the effects of Plaintiff's physical impairments on his ability to work outside that period. While the lack of a medical source statement is not always determinative, the record must otherwise clearly establish "the effect claimant's condition had on his ability to work", which was not the case here. *See Ripley*, 67 F.3d at 557.

The gap in the record put the ALJ in the position of interpreting the effects of Plaintiff's physical conditions, namely his epilepsy, based on his review of the raw medical data for that period. *See Montoya v. Berryhill*, No. 3:16-cv-1594-D-BN, 2017 WL 3835950, at *4 (N.D. Tex. Aug. 1, 2017) ("And it is improper for the ALJ to infer what [plaintiff's] capabilities to work are based on his own interpretation of these records—at least without the assistance of an examining or treating physician."). Accordingly, the ALJ improperly made an independent RFC finding.

For the entirety of both periods in question, Plaintiff was experiencing a progressive seizure condition that varied in intensity and for which the ALJ now wishes to cite isolated examples of improvement for his RFC assessment that Plaintiff can perform the full range of work. In addition to the significant gap in Plaintiff's past medical record, such that the ALJ's RFC assessment for the whole of that time period is not supported by substantial evidence, the ALJ could also be accused of making improper inferences ("playing doctor") in interpreting later medical evidence that appears in the record. For instance, the ALJ is the only individual in the record interpreting the implications of Plaintiff's most recent course of treatment, namely the implantation of the VNS, on his ability to work. As Plaintiff notes implantation of the VNS was hardly indicative of

34

a stable diagnosis of well-controlled seizures prior to that date. But this appears to be an example of a recurring problem in this case, where no opinions were solicited from the relevant treating physicians, namely the neurologists who oversaw Plaintiff's care.

Because of the gaps in the record noted above, the effects of Plaintiff's impairments on his ability to work were unclear, and the undersigned cannot find that the ALJ's RFC determination was supported by substantial evidence. *See, e.g. Raper v. Colvin*, 262 F. Supp. 3d 415, 422–23 (N.D. Tex. 2017) (collecting cases holding that the ALJ is not permitted to independently assess a claimant's RFC without medical evidence addressing the effects a claimant's impairments have on his or her ability to work).

The undersigned finds that the ALJ's RFC determination was not supported by substantial evidence. However, the undersigned also cannot find that the record compels a finding that Plaintiff was disabled for the period in question. Accordingly, it is recommended that this case be remanded for additional administrative proceedings, so that the ALJ can request relevant medical opinion evidence concerning the effects of Plaintiff's seizure disorder on his ability to work.

B. The ALJ's failure to seek medical opinion evidence concerning the impact of Plaintiff's impairments on his ability to work prejudiced Plaintiff.

The ALJ erred in making an RFC determination without medical opinion evidence in the record addressing the impact of Plaintiff's impairments, namely his epilepsy, on his ability to work for the periods highlighted above, and substantial evidence does not support the RFC determination. Nevertheless, reversal is only warranted if the claimant shows that he was prejudiced by the error. "To establish prejudice, a claimant must demonstrate that he or she 'could and would have adduced evidence that might have altered the result.' " *Carey v. Apfel*, 230 F.3d

35

131, 142 (5th Cir. 2000) (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)); see *Ripley*, 67 F.3d at 557 n.22 (citing *Kane*, 731 F.2d at 1220) ("Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.").

Here, the fact that the ALJ did not rely on a medical opinion in determining Plaintiff's RFC raises doubts as to whether the ALJ might have reached a different conclusion had he fully developed the record.  The undersigned also notes that because the ALJ may have found that Plaintiff was even more restricted in his capabilities than even that found by the SAMCs for the 2014 to 2015 period, the VE's statements regarding the existence of light work occupations does not establish that Plaintiff was not prejudiced in this case.

The undersigned therefore concludes that the ALJ's failure to obtain medical opinion evidence regarding the effects Plaintiff's impairments have on his ability to work prejudiced him.  Because the ALJ's RFC determination is not supported by substantial evidence, and because Plaintiff was prejudiced by such error, the Court should remand.

## VI. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the hearing decision be REVERSED and this case REMANDED to the Commissioner of Social Security for further proceedings consistent with these findings and conclusions.  Because all parties have not consented to proceed before a United States Magistrate Judge, the undersigned directs the Clerk of Court to REASSIGN this case to Senior United States District Judge Sam R. Cummings in accordance with normal procedures.

## VII. RIGHT TO OBJECT

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific or sufficient. Failure to file written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except on grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IT IS SO ORDERED this 3rd day of November, 2020.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE

37